STATE OF NEBRASKA V. OMAHA ELEVATOR COMPANY ET AL.*

FILED FEBRUARY 8, 1906.    No. 14,391.

1. **Statutes: CONSTRUCTION.** All statutes upon the same general subject are to be regarded as part of one system, and later statutes are to be considered as supplementary or complementary to those preceding them upon the same subject.

2. ———: ———. Statutes *in pari materia* should be construed together.

3. ———: REPEAL BY IMPLICATION. Repeals by implication are not favored. Where the legislature has passed two statutes upon the same subject, the later covering the entire matter embraced in the first and also additional provisions, the later act supersedes the first and repeals the first by implication. If the later statute does not cover the entire field of the first and fails to embrace within its terms a material portion of the first, it will not repeal so much of the first as is not included within its scope, but the two will be construed together so far as the first still stands.

4. **Anti-Trust Act: REPEAL.** Rule applied, and *held* that the anti-trust act of 1897, known as the "Gondring Act," was repealed by implication by the anti-trust act of 1905, known as the "Junkin Act," except as to the first section thereof defining "trusts."

5. **Statutes: CONSTRUCTION.** Unless it appears from its terms that an act applying to a certain class of persons is meant to cover all inhibitions and regulations affecting them, a later general act applying to all persons and prohibiting in general terms the acts specified in the former act as well as a number of other acts and purposes, defining new crimes and prescribing new penalties, and giving new civil remedies, will not be held to except the persons embraced in the former act from the operation of the latter.

6. **Unlawful Combinations.** Rule applied, and *held* that the acts of 1887 and 1897 prohibiting combinations by grain dealers and others to fix the price of grain, etc., do not except such dealers from the operation of the later general anti-trust acts of 1897 and 1905, applying to all illegal combinations to fix prices, etc.

ORIGINAL action by the state against the Omaha Elevator Company and others.    Defendants demurred to petition. *Demurrers overruled.*

*See opinion on exceptions to referee's report, p. 654, *post.*

*Norris Brown, Attorney General, W. T. Thompson, J. J. Sullivan* and *Jefferis & Howell,* for the state.

*Kennedy & Learned, Hall, Woods & Pound, Smyth & Smith, Courtright & Sidner, Strode & Strode, W. C. Walton, F. A. Brogan, O. B. Polk, I. E. Congdon, A. A. Welch, D. O. Dwyer, L. S. Hastings, John C. Watson, Clark O'Hanlon, Brome & Burnett* and *McDonald & Woodland, contra.*

LETTON, J.

This action was brought by the attorney general of the state of Nebraska, on behalf of the state, against the Omaha Elevator Company, a corporation, and 23 other corporations, and against William H. Ferguson and 25 other individuals. The petition alleges, in substance, that each and all of the defendant corporations and individuals are, and for many years have been, engaged in the several counties of the state of Nebraska in the business of dealing in and shipping of grains of all kinds, and were the owners and operators of over 400 elevators at stations along railway lines of said state, and that by reason of these facilities they are doing and have done an annual business in dealing in Nebraska grain to the amount of about 200,000,000 bushels a year; that the defendants now, and for the last three years have been, wilfully and unlawfully combining and conspiring together for the purpose of pooling the prices to be paid for all kinds of grain in Nebraska, and for the purpose of dividing between themselves the aggregate or net proceeds of the earnings of themselves, and for the purpose of fixing the prices to be paid for, and preventing competition and restraining trade and commerce in grain in said state, so as to give them and each of them a monopoly of the grain trade in this state, to the end that they might enjoy unreasonable and unconscionable profits, and that these unlawful purposes have been attained. That the defendants, for the

purpose of carrying out the conspiracy, organized what is known as the Nebraska Grain Dealers Association; that certain defendants (naming them) are the officers of said association; that by the rules of the association no person or corporation was eligible to membership therein unless he or it was engaged in the buying, selling or shipping of grain and owned one or more elevators situated upon the right of way of some railroad, and no person or corporation was eligible who owned, controlled or operated an elevator or "scoop-shovel house" off the right of way; that all the defendants are members of said association and are known to each other and designated as "regular grain dealers." All other dealers are known to the members of said association as "irregular grain dealers." That there are and were for the last three years in Nebraska more than 1,200 grain elevators controlled by said association and subject to its rules, by-laws, regulations and penalties, adopting and agreeing to the prices fixed for grain bought and sold by the officers of the association, and doing business only with such persons and elevators as they should name; that there are less than 50 independent elevators and grain dealers in the state of Nebraska; that the defendants control at least 90 per cent. of the grain trade in this state; that they intend to continue such combination, and will compel their respective members, agents and servants to refrain from bidding against each other, except perfunctorily, and by these means compel the owners of grains to sell at prices less than they would receive if the bidding was really and in truth competitive. That they have arbitrarily, from time to time, raised, lowered and fixed the prices of grain, and have undertaken, and do now undertake, to maintain uniform prices at which they will buy grain throughout the state. This purpose is and has been accomplished by means of secret meetings of the officers of said association, where the prices of grain are fixed, to be in force until changed by some subsequent meeting; that the prices are thereby maintained directly by the defendants, and by collusively restricting the volume

of trade, by imposing and collecting penalties for the violation of the rules of the association, by notifying one another of the delinquencies of any of its members and by keeping a black list of delinquents and refusing to deal with them, the price of grain is established and competition entirely destroyed. That the defendants have each and all engaged in, and will continue, agreements and arrangements with the several railroad companies doing business in Nebraska, whereby they receive secretly, by means of rebates and other devices, freight rates less than those charged the public, and thereby no competitor is able to engage or continue in the grain business, which facts result in giving the defendants a monopoly of the trade in grain in this state. That the defendants intend to continue and to sustain and carry on all the unlawful practices before recited, all in violation of law and to the irreparable injury of the public. That the defendants who are domestic corporations have abused and violated their franchises and forfeited their right to exist and do business in this state, and those defendants which are foreign corporations have likewise abused their franchises and forfeited their right to longer engage in business in Nebraska, by wilfully violating the laws of this state.

The prayer of the petition is that the defendants be adjudged guilty of the acts complained of, and be perpetually restrained from every connection with the Nebraska Grain Dealers Association; that the association be dissolved; that the defendants who are officers of the association be perpetually enjoined from acting as such officers; that the defendants who are domestic corporations be dissolved and ousted of their corporate franchises, and that those who are foreign corporations be decreed to have abused their franchises to do business in this state and be forever ousted from the further exercise of the same in this state; that the defendants be perpetually enjoined from engaging in any contract or combination with one another, or with other persons or corporations, to prevent or limit competition in the grain trade, or to fix and con-

trol the prices, or to divide the net profits, or to enter into any agreement for the pooling of prices, or to solicit or receive rebates from any railway company, or to create or carry out any restrictions or to limit or reduce the price, and for general relief in equity.

To this petition the defendants have severally filed demurrers, upon the grounds that the court has no jurisdiction, that the plaintiff has no legal capacity to sue, that there is a defect of parties defendant, that several causes of action are improperly joined and that the petition does not state facts sufficient to constitute a cause of action.

In order to understand the contentions made by the defendants, it will be necessary to review the legislation in this state having for its object the prevention of combinations, trusts, monopolies, pools and other devices designed to restrain competition. In 1887 the legislature passed an act entitled "An act to prohibit grain dealers, persons, partnerships, companies, corporations, or associations from combining or entering into any agreement or contract to pool or fix the price to be paid for grain, hogs, cattle or stock of any kind whatever, and to provide punishment for violations of the same." The substance of this act is that it was declared unlawful for any persons, partnerships, corporations or associations to enter into any agreement, contract or combination with any other of the same class for the pooling of prices of competitive dealers and buyers, or to divide between them the aggregate or net proceeds of their earnings, or for fixing the price which any of them should pay for grain, etc., and each day of the continuance of such acts was to be deemed a separate offense. In case of a breach of any of the provisions of the act, the guilty person or association was declared to be liable to the person or persons injured to the full amount of damages sustained. It was provided that the court might compel the attendance of the defendant and other grain dealers as witnesses, and the production of their books and papers; that evidence tending to criminate should not excuse the witness from testifying, but such evidence should not be

44

used against such person in the trial of a criminal offense. Whoever was guilty of any. violation of the act was to be deemed guilty of a misdemeanor and, upon conviction, fined in any sum not exceeding $1,000 or imprisoned in the county jail not exceeding 6 months. Laws 1887, ch. 114.

The next act in point of time was passed in 1889 (laws 1889, ch. 69), and is entitled "An act to prohibit persons, partnerships, companies, associations or corporations engaged as manufacturers or dealers from entering into any understanding, contract, combination, pool or trust for any purpose whatever, and to provide punishment for violations of the same, and providing means for the suppression of such evils, and remedies for persons injured thereby." The act was in accordance with its title, but as it was afterwards expressly repealed it is unnecessary to set it forth specifically.

In 1893 an act was passed with the following title: "An act to prohibit lumber dealers, coal dealers or other persons, companies, partnerships or associations from entering into any contract or agreement or combination to pool or fix the price at which lumber or coal shall be sold, and to provide punishment for violation of the same." Laws 1893, ch. 49. Since this act does not affect dealers in grain its details are not important here, and we merely mention it as a part of the course of legislation upon the general subject.

Four years afterwards, in 1897, Mr. Gondring introduced an act which was passed, the title of which is "An act to define trusts and conspiracies against trade and business, declaring the same unlawful and void, and providing means for the suppression of the same, and remedies for persons injured thereby, and to provide punishment for violations of this act, and to repeal chapter 91a, entitled 'Trusts,' of the Compiled Statutes of Nebraska for the year 1895." Laws 1897, ch. 79. Section 1 of this act contained a definition of the word trust. Section 2 declared all acts by any person or persons carrying on, creat-

ing or attempting to create a trust to be a conspiracy against trade and business, and unlawful, and provided that the guilty party should be deemed guilty of a misdemeanor and fined not less than $25 nor more than $5,000. Section 3 provides that any domestic corporation which violates any of the provisions of the act shall forfeit its charter and franchise, and its corporate existence shall thereupon cease and determine, and makes it the duty of the attorney general, or county attorney within his county, upon his own motion, to institute suit or *quo warranto* proceedings for the forfeiture declared. Section 4 denies to nonresident corporations and persons guilty of a violation of the act the right to do business within the state, and makes it the duty of the attorney general, and each county attorney within his county, to enforce this provision by injunction or other proper proceedings in the name of the state, on his relation. Other sections provide that a general allegation shall be sufficient in an indictment or information, prescribe the quantum of proof required, provide that contracts in violation of the act shall be absolutely void, that the purchaser from a trust is not liable for the price of any article purchased, for the recovery of damages by any person injured, for the production of books and papers, and that witnesses should not be excused from testifying. Section 13 defines the word persons as including all classes of partnerships, corporations and associations, foreign and domestic, and section 14 repeals chapter 91a of the Compiled Statutes for 1895, which is the general trust act of 1889.

At the same session of the legislature, in 1897, another act was introduced by Mr. Loomis, and passed, relating to grain dealers. Laws 1897, ch. 80. The title of the act is lengthy, but the substance of the act is as follows: Section 1 makes it unlawful for any person, partnership, association or corporation engaged in the grain business to enter into any combination with any other like class, or to form, enter into or contribute to any trust, pool or combination which has for any of its objects the prevention of

competition among dealers, buyers or sellers of grain, etc. Section 2 provides for the liability of the guilty party to the party injured to the full amount of damages sustained, with reasonable attorney's fees. Section 3 makes the violation of the act a felony and the penalty not less than $1,000 nor more than $2,000, and in addition permits a 6 months' sentence to the penitentiary. Section 4 provides that any person aggrieved may prosecute the violator in a criminal action by his own attorney, and in case of conviction a reasonable attorney's fee shall be allowed.

The last expression of the legislature on this general subject was an act introduced at its session in 1905 by Mr. Junkin, which was entitled "An act to protect trade and commerce against unlawful restraints and monopolies, and to prohibit the giving or receiving of rebates on the transportation of property, and to provide a penalty for the violation thereof." Laws 1905, ch. 162. The act consists of 22 sections covering over 10 pages of the session laws. In substance, the law concerns trusts and monopolies, and declares them to be unlawful, and punishes any person engaged in a trust or attempted monopoly by declaring the same to be a misdemeanor punishable by a fine not exceeding $5,000 or imprisonment not exceeding one year, or both, and forfeiting the property of any such trust or combination to the state. It provides for the filing of annual statements by nonresident corporations and associations, and for filing an acceptance by its officers of the provisions and liabilities of the act. It prohibits underselling for the purpose of driving out business competitors, under like penalties. It provides that any corporation or association that shall have been twice adjudged to have violated the provisions of the act shall no longer be allowed to engage in business within this state; makes it the duty of the attorney general to enforce the provisions of the act by indictment or information; makes the officers of such corporation or association liable for all the debts of the company, and punishable by fine in addition.

The act also makes it unlawful to grant or to accept rebates for the transportation of any property within the state, and provides a penalty therefor. Section 16 provides that the several courts of record of this state having equity jurisdiction are hereby vested with jurisdiction to prevent and restrain all violations of this act, and to prevent or restrain any such corporation or combination which shall have solicited, accepted or received any such rebate or which shall have offered, granted or given any special prices, inducements or advantages in order to restrain or destroy competition in particular localities from engaging in commerce within this state. Other provisions are similar to those of the "Gondring Act."

It will be observed that only one of these acts has been expressly repealed, and, as is contended by the defendants, it becomes a question of first importance to determine which of these acts is applicable to the defendants in this case and to the contracts, agreements and combinations which it is charged they have entered into. The contention of some of the defendants is that, if the suit had been brought before the passage of the act of 1905, no liability on the part of the defendants would arise by virtue of the general anti-trust act of 1897, but the measure of their liability would be found in the grain dealers act of 1887 or in the Loomis act of 1897, which do not provide for a remedy by injunction. The ground of this contention is that the two acts of 1887 and 1897 having special reference to dealers in grain, the general act of 1897, known as the "Gondring Act," would not affect their operation, since a general statute operates upon all subjects embraced therein, except the particular one which is the subject of a special act. They further contend that the act of 1905 repeals by implication the general anti-trust statute of 1897, but, being a general act, has no effect upon the special statutes of 1887 and 1897 relating to grain dealers. The other defendants take the position that the law of 1905, being a general law covering the whole subject embraced in all the former statutes, repeals them all by implication and

is the sole enactment now in force. On the other hand, the attorney general contends that the correct view of the matter is that all the trust acts should be regarded as a single measure of legislation enacted for the protection of trade and commerce; that repeals by implication are not favored; that they are statutes *in pari materia* and should be construed as though they had all been passed at the same time and under one title. He further contends that, in the absence of any statute, the state has the right to the relief prayed for under the principles of the common law, and that, whatever may be the conclusion arrived at as to the statutes, the demurrer should be overruled.

The first question, then, for the court to determine is as to which of these rules of construction should be applied in ascertaining what is the statute law as it now stands which it is claimed that the defendants have violated, and whether this procedure is authorized by the statutes. The law of 1905 is the only statute which in express terms gives the right to the attorney general, upon behalf of the state, to apply for and receive, in a proper cause, the equitable remedy of injunction against any but foreign corporations, and, unless the provisions of this act are applicable, the state must rely upon the proposition that, independent of any statute, the right to restrain illegal combinations, such as is alleged the defendants have made, is a right to which it is entitled under the provisions of the common law. It is a matter of history and public knowledge that, while the origin and growth of combinations and conspiracies in restraint of trade is as old as organized society, the unprecedented volume and extent to which such unlawful combinations have now attained has been a matter of but recent growth. The enactment of statutes designed to remedy the injury to the public and to individuals which such associations are believed to inflict has to a measurable extent attempted to keep pace with the growth of the evil. When a law proved ineffectual to accomplish the desired end, a new enactment would be passed, and when, by some ingenious procedure or device, this

law would in its turn be evaded or rendered ineffective, another statute more sweeping in its terms, and usually more drastic in its penalties, would be the response of the legislature. Eighteen years ago the legislature of this state first enacted a law upon this general subject. This law prohibited all persons from combining to fix the price to be paid for "grain, hogs, cattle or stock," and provided penalties for the violation thereof. Two years afterwards a general act was passed prohibiting combinations to fix the price of any natural product or any article of commerce, and prohibited pooling and trusts, under like penal provisions. This act was repealed in 1897. An act was passed in 1893 relating to lumber and coal dealers only. In 1897 a general act, known as the "Gondring Act," was again passed, defining trusts and providing new remedies not before given by the prior laws. At the same session an act was passed with reference to grain dealers, known as the "Loomis Act." This act is conceded by the state and some of the defendants to be unconstitutional, by reason of defects in its enactment, but other defendants treat the same as being in full force. The most extensive and elaborate enactment covering the general subject, and providing preventives for the future occurrence of the evils, remedies for the relief of persons injured and penalties for violation of its provisions, is the act of 1905, known as the "Junkin Act."

It will be seen from this review of the legislation upon this subject that there has been a gradual growth and development of the law designed to counteract the evils of unlawful combinations, and that from time to time, as necessity seemed to require, the legislature endeavored to provide such measures as the nature of the case seemed to demand. While in minor matters, such as the severity of the penalty to be inflicted for a violation of the law, there is a variance between the several enactments, in the main the purpose and intent of the entire series is the same. It will be observed that each one of the later acts includes within its condemnation some element which had

hitherto escaped mention in the former statute. While perhaps a liberal construction of the language used in the "Junkin Act" might make it include within its terms all things prohibited by the former statutes, still, since penal statutes are not subject to liberal construction, unless any act which is specified in the later statute as a crime is not so designated in the former acts, it is not included in their terms and constitutes an addition to the already existing body of law upon the subject. We think it clear that the whole series of statutes directed against combinations and monopolies should be considered as parts of a connected system, and that no one act should be singled out for construction and be considered apart from the general trend of legislation upon the subject. Statutes *in pari materia* are to be construed together, and repeals by implication are not favored. The courts will regard all statutes upon the same general subject matter as part of one system, and later statutes should be construed as supplementary or complementary to those preceding them. They are to fill up the gaps left by former attempts to mend the evil. It has been said: "In the course of the entire legislative dealing with the subject we are to discover the progressive development of a uniform and consistent design, or else the continued modification and adaptation of the original design to apply it to changing conditions or circumstances. In the passage of each act, the legislative body must be supposed to have had in mind and in contemplation the existing legislation on the same subject, and to have shaped its new enactment with reference thereto." Black, Interpretation of Laws, sec. 86. The rule is that all statutes *in pari materia* must be taken together and construed as if they were one enactment. *Hendrix v. Ricman*, 6 Neb. 516; *State v. Babcock*, 21 Neb. 599; *People v. Weston*, 3 Neb. 312. Statutes should be so construed, if possible, as to give effect to every provision, and an act should not be placed in antagonism with another act, unless such was the manifest purpose and object of the legislature. See *McCann v. McLennan*, 2 Neb. 286; *Bur-*

*lington & M. R. R. Co. v. Webb,* 18 Neb. 215; *State v. Babcock,* 21 Neb. 599; *Barker v. Wheeler,* 71 Neb. 740; *Jackson v. Washington County,* 34 Neb. 680; *Dawson County v. Clark,* 58 Neb. 756.

Another well-settled principle is that, where the legislature has passed two statutes upon the same subject, the last one covering the entire matter embraced in the first and also containing additional provisions, the last act supersedes the former and repeals it by implication. *Brome v. Cuming County,* 31 Neb. 362.    But this is true only so far as it appears that the intention of the lawmakers was to make an entire revision or substitution of the new enactment for the old.    Repeals by implication are not favored.    Where the legislature has passed two statutes upon the same subject, the last covering the entire matter embraced in the first and also additional provisions, the last act supersedes the first and repeals the first by implication.    But if the latter statute does not cover the entire field of the first and fails to embrace within its terms a material portion of the first, it will not repeal so much of the first as is not included within its scope, but the two will be construed together, so far as the first still stands.    It is apparent that the Junkin act of 1905 in a large measure covers the same subject matter as the Gondring act of 1897.    Its provisions in some respects are more specific.    It is preventive in its nature as well as remedial, and it is apparent that it was intended by the legislature to cover the same subject matter and to furnish like and additional remedies to those provided by the Gondring act.    It evidently was intended to be a substitute for that act, in so far as the preventive and remedial features are concerned.    It fails, however, to specifically define or construe or determine what a "trust" is.    We think that recourse may be had, however, to the definition of "trust" in the first section of the Gondring act to throw light upon what the legislature meant when it prohibited "every combination in the form of trust" in the Junkin act.    The extent of the repeal of the former act is measured by the

extent to which it covers the subject matter, and if any portion of the former act is not inconsistent with or repugnant to the latter, and it can fairly be said that it was within the contemplation of the legislature when the later statute was enacted, it will be upheld and construed as forming a part of the later enactment. *State v. Grady,* 34 Conn. 118; *Wood v. United States,* 16 Pet. 343; *Putnam v. Ruch,* 54 Fed. 216. It is maintained by the defendants that the 1905 act repealed *in toto* the Gondring act of 1897. With this contention we agree, except that we are of the opinion that the first section thereof still stands and may be used to define and interpret the later act, as to what constitutes a "trust."

It is insisted that the general provisions of the act of 1905 do not affect the defendants, since their duties and liabilities are measured only by the acts relating to grain dealers specifically. The proposition maintained by the defendants is that, where there is found a special statute dealing with a particular subject and also a general statute broad enough in its terms to include the matters covered by the special statute, as well as other matters, the general statute will be held to apply to all matters not specifically covered by the special statute and, as to such matters, the special statute alone will apply. The same argument was made by the defendants in the case of the *United States v. Trans-Missouri Freight Ass'n,* 166 U. S. 290, 17 Sup. Ct. Rep. 540, where it was urged that the special commerce act related solely to railroads and their proper regulation and management, and that pooling was not forbidden therein, while the later general trust act applied to all contracts of the nature therein described entered into by other than common carriers, and was not applicable to railroads. The United States supreme court, Mr. Justice Peckham delivering the opinion, said:

"The first answer to this argument is that, in our opinion, the commerce act does not authorize an agreement of this nature. * * * If the agreement be legal it does not owe its validity to any provision of the commerce

act, and if illegal it is not made so by that act.   *   *   *
Although the commerce statute may be described as a general code for the regulation and government of railroads upon the subjects treated of therein, it cannot be contended that it furnishes a complete and perfect set of rules and regulations which are to govern them in all cases, and that any subsequent act in relation to them must, when passed, in effect amend or repeal some provision of that statute. The statute does not cover all cases concerning transportation by railroad and all contracts relating thereto. It does not purport to cover such an extensive field. The existence of agreements similar to this one may have been known to congress at the time they passed the commerce act, although we are not aware, from the record, that an agreement of this kind had ever been made and publicly known prior to the passage of the commerce act. Yet if it had been known to congress, its omission to prohibit it at that time, while prohibiting the pooling arrangements, is no reason for assuming that when passing the trust act it meant to except all contracts of railroad companies in regard to traffic rates from the operation of such act."

When the legislature of the state passed the acts of 1887 and 1897 relating to grain dealers, there is no reason to assume that it knew of the existence of a number of practices which are inhibited by the Junkin act, but not inhibited by these acts, and there is no reason for assuming that, when passing the Junkin act, it meant to except grain dealers from its operation in regard to practices prohibited therein not specially mentioned in the former acts. It may be said, as was said by COBB, C. J., in *State v. Arnold,* 31 Neb. 75:

"An examination of the law as it then existed could not fail to develop the necessity of further legislation to accomplish the object in view, but pointed out no provision or language in that already upon the statute book, not necessary or convenient to other purposes of equal utility. There was simply a *casus omissus* and not a misapplication

of provisions or words in the statute. The end desired could be attained by new and independent provisions and not by amending or changing the old ones." See also *State v. Phipps*, 95 Ia. 491.

An act of the legislature of this state provided that, if a county treasurer should neglect or refuse to render any account required by law, or fail to account for any balance due any of the political subdivisions, or was guilty of any other misconduct, the county board might forthwith remove him from office. An earlier act provided that all county officers might be charged, tried and removed from office for certain official misdemeanors, and provided that charges should be made and a hearing had. While the later act provided apparently for a summary removal of a county treasurer and, hence, was special in its nature to that extent, as applying to that office alone, while the earlier act was general, the court held that these statutes were *in pari materia*, and before the treasurer could be removed he was entitled to be tried under the provisions of the general act. *State v. Sheldon*, 10 Neb. 452. Unless it appears from its terms that an act applying to a certain class of persons is meant to cover all inhibitions and regulations affecting them, a later general act applying to all persons, and prohibiting in general terms the acts specified in the former act, as well as a number of other acts and purposes, defining new crimes and prescribing new penalties, and giving new civil remedies, will not be held to except the persons embraced in the former act from the operation of the latter. 1 Lewis' Sutherland, Statutory Construction, p. 528; 1 Kent, Commentaries, *462. The general act of 1905 covers many matters not specifically covered by the special statutes. It will be observed that the petition charges a number of acts, intentions and purposes which are inhibited by the general law and are not under the ban of the grain dealers' acts. It is charged that the defendants combined and conspired with the intention to prevent others from engaging in or carrying on a like business. That they combined and conspired

in restraint of trade and to monopolize the commerce of grain in Nebraska. It is further charged that as a part of their wrongful operations they solicited, accepted and received rebates from railroads and in such manner obtained an advantage over other dealers; that they formed rules refusing to do business with persons not members of their association, and that no person could be admitted thereto unless he owned an elevator upon a line of railroad. These acts are not embraced in the laws of 1887 and 1897, and whatever may be said as to the contention of the defendants that general laws are to be modified by special acts upon the same subject, where the special act fails to cover the point and a new remedy is afterwards provided by a general act, both acts may stand together and both be enforced, where not in conflict with each other. *United States v. Trans-Missouri Freight Ass'n, supra.* The whole question is one of intent of the legislature and we think the intention is clear. It is not necessary in this case to determine which of the penalties imposed for a violation of the criminal provisions of these statutes are applicable in case of criminal proceedings, or whether or not the 1897 law repealed by implication the act of 1887, or whether the Loomis act of 1897 is unconstitutional, as claimed by some of the defendants, or whether the Junkin act repealed both the 1887 and 1897 acts. It is sufficient to say that, in so far as the remedy by injunction is granted by the Junkin act, that remedy is not curtailed or taken away as to grain dealers by the provisions of any prior act.

Much time and labor have been devoted by counsel for both parties for and against the proposition that the general powers of a court of equity under the common law are sufficient to authorize the maintenance of such a suit as this by the attorney general, and the granting of relief by injunction. The discussion in the briefs is lengthy, able and interesting, and, if necessary, the court would consider the questions therein discussed, but, having reached the conclusion that the action is authorized by statute, this

question becomes merely academic and of no practical importance in this case.

The motion and demurrers are

OVERRULED.

The following opinion on exceptions to report of referee and motion to dismiss was filed December 21, 1906. *Exceptions overruled:*

1. **Depositions** cannot be used as evidence against parties who were not notified of the time and place of taking the same, and did not participate therein.

2. **Corporations:** INJUNCTION:' FORFEITURE OF CHARTER. In an action under the statute, commonly called the "Junkin Act" (laws 1905, ch. 162), to obtain an injunction restraining violations of the act, the court is not authorized, in the first instance, to declare a forfeiture of the charters of corporations found to have violated the act.

3. **Interstate Commerce.** The allowance by railroad companies of certain charges, as elevator charges, to terminal elevators on shipments of grain from points in this state to points without the state is an incident of interstate commerce, and this court has no jurisdiction to limit or control the same.

4. **Reference:** REPORT: MOTION TO RECOMMIT. Upon the filing of the report of a referee in an action brought originally in this court, there is no doubt that the court in its discretion might, upon motion of one of the parties, recommit the matter to a referee to take additional evidence and report thereon. But when there has been a fair hearing before the referee, and there is no evidence of accident or surprise preventing a full investigation of the facts, nor that further evidence can be furnished that might probably change the result reached by the referee, such motion will be denied.

5. **Report of Referee:** EVIDENCE. The report of a referee will not be set aside, because it appears that he has given more weight to certain evidence tending to support his report than the facts, as shown by the whole record, will warrant. If the evidence considered together supports his findings it is sufficient.

6. **Unlawful Associations:** SUIT TO ENJOIN. For several years prior to the time the act of 1905 took effect, the defendants had been engaged, through the means of an association which they had formed for that purpose, in a systematic course of conduct made unlawful by that act. In forming that association and becoming

members thereof, they had agreed to continue to promote its objects until they severed their relations with it. In the absence of evidence showing affirmatively that they had taken the necessary steps to sever their connection with the association before or at the time the act took effect, the presumption will obtain against them that this action, brought soon after the act took effect, to enjoin a continuation of the association and restrain the defendants from carrying out its purposes, was necessary and proper for the enforcement of the act.

SEDGWICK, C. J.

In overruling the general demurrer to the petition the nature of the case as disclosed in the petition was stated, and the various statutes against illegal agreements and combinations in restraint of trade were discussed. *Ante,* p. 637. Subsequently the issues were formed, and Mr. L. M. Pemberton was appointed referee to take the evidence, and report his findings of fact and conclusions of law. This duty was performed by the referee, and a comprehensive report was filed. Exceptions to this report were filed by the state and also by various defendants.

The referee's findings of fact upon the main issues are as follows: (1) "Sometime prior to the year 1899, an association known as the Nebraska Grain Dealers Association was organized in this state, which adopted a constitution and by-laws under which it operated. Its officers consisted of a president, vice-president, secretary, treasurer, and a governing board consisting of the president, secretary and three other members of the association. (2) The object of such association, as expressed in the preamble of its constitution, was the advancement and protection of the common interests of those regularly engaged in the grain business, the formulation of rules for the transaction of business, and the promotion of friendly relations among legitimate grain men of the state. (3) According to the constitution, 'any person, firm or corporation conducting a reputable, regular, and continuous business of buying and selling grain, and having proper facilities for handling same, may be admitted to membership in

this association.' And 'any regular grain receiver, track buyer, terminal elevator, or commission merchant who conducts a reputable business, and confines his business to the regular elevator operators, shall be eligible to membership on the payment of regular fees and shall be rated as the owner of one elevator.' And no person, firm or corporation could be admitted to membership unless he or it should receive the unanimous approval of the governing board, subject to the approval of the association, and should subscribe the constitution and by-laws. (4) It was made the duty of the governing board to look after the interest of the association between all meetings; to follow the general policy outlined by the meetings, transact the necessary business of the association, investigate all complaints that might come before them, and work for their adjustment, act as a board of appeals and arbitration, and have all powers delegated to them by the constitution and by-laws. (5) It was provided that each member of the association should be governed in all matters pertaining to the association by the governing board, and a failure to obey the orders of the governing board subjected him to a fine not to exceed his membership fee, or expulsion, as the governing board should decide, subject to appeal to the association. (6) It was provided in the by-laws that no person should be allowed at any meeting of the association or governing board, unless a member in good standing, except as a witness in case of trial. (7) According to the evidence introduced by the state (there was no evidence introduced by the defendants) the main objects of said association were to fix, regulate and control the prices of grain in this state; to put an end to competition in the grain business; and to drive out of business all irregular and independent dealers in grain. (8) There were about 1,200 grain dealers, all told, in the state on April 1, 1905, of whom about 770 belonged to said Nebraska Grain Dealers Association, and about 200 more were in sympathy with such association. (9) To accomplish the objects of said association as above set forth, various expedients were re-

sorted to by it, some of which were as follows: (a) A
price committee, consisting of persons chosen from five
of the leading corporation members of said association,
was formed, whose business it was to fix the prices which
should be paid for grain by the various members of said
association throughout the state, and the other regular
dealers who worked in harmony with said association.
All such members and persons were notified by card what
such prices were, and as members of such association and
regular dealers they were expected and required to fix
their bids for grain on the basis of the prices sent to
them on the cards, and they were not to pay any more
for grain than other regular dealers in the same locality.
For the purpose of facilitating the business, the state was
divided into thirteen districts, and it was the duty of some
member of the association, selected for that purpose on
account of his or its superior location and facilities for
that purpose, to send cards to all the regular dealers in
his district. The prices were changed as often as the
fluctuations of the market made it necessary, sometimes
every day, and sometimes less often. The new prices al-
ways went into effect on the morning of the day succeed-
ing the issuance of the cards, and never on the same day.
In said manner and by said method uniformity of prices
was maintained amongst the members of said association
and other regular dealers over the state. Regular dealers
were those who were in harmony with the purpose and
objects of said association. (b) In a town where there
were two grain dealers, one or both of whom were 'ir-
regular' and refused to abide by the prices sent out on
cards as aforesaid, the association resorted to various
methods to force such dealer or dealers to become 'regu-
lar.' The committee of the association, or some one ap-
pointed by it for that purpose, would send some person or
persons to visit such irregular dealers, whose business it
was to prevail upon such dealers to agree to abide by the
prices fixed as aforesaid, and also to agree upon a division
of the grain marketed at said station between them so that
45

there would be no competition between them in the purchase of such grain. In this the person or persons so sent out were generally successful. If a dealer at any point persisted in being 'irregular,' he was summarily dealt with according to circumstances. If weak financially, prices would be raised on him so that he could not make any money and he would be forced to surrender or get out of business. If he was strong financially, so as to make such a proceeding as that just named unprofitable for the association, the bidders in the market where he sold would be prevailed upon to bid him less than the market price for his grain, so that he could not sell for as much as the regular dealers. By such means the 'irregular' dealers were generally either driven out of the business or forced to become 'regular.' (c) The association also made it a part of its business to look after legislation, in order to prevent any laws from being passed which were unfavorable to the interests of the 'regular' dealers. The testimony shows that during the 1903 session of the legislature several thousand dollars were spent by the association through its agents in trying to prevent unfavorable legislation. (d) The farmers' grain and elevator companies were the especial aversion of the Nebraska Grain Dealers Association, and the latter exerted themselves greatly to prevent the former from getting into, and doing business in, this state. The railroad companies were labored with to induce them to refuse sites for elevators to be put up by farmers' elevator companies. The members of the association and other regular dealers refused to deal with farmers who shipped their own grain, or with the farmers' elevator companies, and also with any person who would deal with such irregular dealers. (10) The evidence shows that, by such means as the foregoing and other means not herein mentioned, the said Nebraska Grain Dealers Association attempted to, and did, in a large measure, fix and control the prices paid for grain throughout this state; prevented competition in the grain business; and largely monopolized the grain business in this state.

(11) The evidence also shows that all of the defendants, except the Holmquist Grain & Lumber Company and William B. Banning, who had no notice of the taking of the depositions in relation to the foregoing matters, were members of said grain dealers association or regular dealers working in harmony therewith, and most of the defendants were active members in carrying out the purposes and objects of said association. (12) I also find from the evidence that said Nebraska Grain Dealers Association was in existence and engaged in carrying out the objects herein mentioned and described at the time of the commencement of this action, and that said defendants mentioned in the last paragraph were then members of said association, giving it their aid and assistance."

The conclusions of law are stated by the referee in these words: "On the whole case I conclude, as a matter of law, that the plaintiff is entitled to have the temporary injunction or restraining order granted herein made perpetual, except in so far as it restrains the defendants from soliciting or receiving rebates from any railroad company. This exception is made for the reason that the evidence does not show that the defendants, or either of them, was soliciting or receiving a rebate from any railroad company or threatening to do so. Such decree should apply to all the defendants, except the Holmquist Grain & Lumber Company and William B. Banning, who had no notice of the taking of the depositions which were taken on the question of a combination and conspiracy in restraint of trade, and are therefore not bound by the evidence contained in said depositions. As to them this action should be dismissed without prejudice."

1. The first exception to the report of the referee on the part of the state is as follows: "Excepts to the conclusion of law that the case should be dismissed as to the Holmquist Grain and Lumber Company and W. B. Banning." These defendants filed with the referee objections to the depositions so taken, and, of course, the depo-

sitions should have been suppressed as to those defendants who were not notified of the time and place of taking the same, and did not participate therein. This exception should therefore be overruled. The same objection was made by the Peavey Elevator Company, American Grain Company, Atlas Elevator Company, Anchor Grain Company and Spelts Grain Company. The defendants John T. Evans and the Evans Grain Company did not participate in the taking of the depositions of the witnesses Overton, Worral and Peavey, and had no notice that the same would be taken. These were very important witnesses for the state. The evidence should not be used against these defendants, and without it the evidence of the state is insufficient.

2. The second exception of the state to the report of the referee is: "Excepts to the conclusion of law that the plaintiff is not entitled on the facts found by the referee to a forfeiture of the corporate franchises of the defendant corporation." Provision for forfeiture of corporate franchises of corporations violating the laws against illegal agreements and combinations in restraint of trade were enacted in the act of 1897, known as the "Gondring Act." (Laws 1897, ch. 79.) In our opinion upon the demurrer, *ante,* p. 637, it was said:

"It is maintained by the defendants that the 1905 act repealed *in toto* the Gondring act of 1897. With this contention we agree, except that we are of the opinion that the first section thereof still stands and may be used to define and interpret the later act, as to what constitutes a 'trust.'"

The discussion of this proposition by the referee in his report is worthy of repetition here. He says: "The first important question to determine is under what law or statute this proceeding is brought. The state contends that it is brought and is maintainable under the act of 1897, known as the 'Gondring Act' as well as under the act of 1905, know as the 'Junkin Act'; and that under the former act it is entitled to have a forfeiture of the franchises

of the defendant corporations declared.   The defendants
contend that the action can only be maintained, if at all,
under the Junkin act, and that under it no forfeiture of
the franchises can be declared.   In view of the findings of
fact hereinafter made, it becomes important to determine
this question.   The Gondring act provides that any cor-
poration organized under a law of this state which vio-
lates any of the provisions of said act shall thereby forfeit
its charter and franchise, and its corporate existence shall
thereby cease and determine.   This is a drastic provision,
and leaves no discretion in the courts.   The Junkin act
provides 'that any corporation   *   *   *   that shall have
been twice adjudged to have violated the provisions of this
act by the final judgment of any court having jurisdiction
of the question in any civil suit or proceeding in which said
corporation   *   *   *   shall have been a party, who shall
thereafter violate this act,   *   *   *   shall no longer be
allowed to engage in business in this state; Provided, That
such prohibition shall only be enforced after such corpora-
tion   *   *   *   shall have been enjoined against further
engaging in such business, on an information or suit
brought in a court of competent jurisdiction, by the at-
torney-general, in behalf of this state.'   And even then, if
the attorney general or the court should deem that the
interruption of the business of such corporation would
cause serious public loss or inconvenience, a limited or
conditional decree to take effect at a future day may be
entered by the court.   In this respect the Junkin act is
much milder and more favorable to offending corporations
than the Gondring act.   It is perfectly plain that in this
respect the Junkin act, being the later act, repeals the
Gondring act, because both acts could not be in effect at
the same time in relation to the same offense.   The one
would nullify the other.   And this court has held in this
case, as I understand it, that the Junkin act repeals all
of the Gondring act except the first section, which merely
defines what a trust is.   But the state contends that, not-
withstanding the Junkin act may repeal the Gondring act

as to future offenses, yet by virtue of section 2, chapter 88 of the Compiled Statutes 1903, there is a saving of all causes of action which had accrued under the Gondring act before the Junkin act went into effect, and that, therefore, the Gondring act applies to all offensive acts charged in the petition which arose prior to July 1, 1905, when the Junkin act went into effect. Section 2 of chapter 88, above referred to, provides that 'whenever a statute shall be repealed, such repeal shall in no manner affect pending actions founded thereon, nor causes of action not in suit that accrued prior to any such repeal, except as may be provided in such repealing statute.' Ann. St. 6966. The question is: Does this saving statute continue the Gondring act in force as to all acts committed in violation of it prior to its repeal? In reference to said saving statute this court, in *Kleckner v. Turk*, 45 Neb. 176, quoting from Sutherland on Statutory Construction, says: 'The legislature has power to pass a general saving statute, which shall have the force and effect to save rights and remedies, except where the repealing statute itself shows that it was not the intention of the legislature that such rights and remedies should be saved.' So that, after all, it is a question of what the legislature intended in each case that determines the matter.

"The question then is: Did the legislature intend, in enacting the Junkin bill, that all corporations which had, prior to July 1, 1905, been in a combination or conspiracy to restrain trade or control prices should be utterly destroyed, while corporations guilty of exactly the same offenses after July 1 should merely be enjoined from their evil practices, but otherwise be permitted to continue in their legitimate business undisturbed? Did the legislature intend that one set of corporations should suffer utter extinction for doing what other corporations should merely be restrained from doing if the court in its judgment thought that the proper thing to do? It would not seem that the legislature intended to discriminate so greatly against one offender and in favor of another of exactly the

same offense.   It would rather seem that the legislature, in enacting the Junkin bill, intended to adopt and pursue a radically different course toward such offenders from that provided in the Gondring act; and there is no reason to suppose that it intended to make so great a discrimination between those who offended prior to a certain date and those who offended subsequently to such time.   If it had intended to make such a distinction it would have given some intimation of it in the new act itself.   The mere fact that the Junkin act only provides for the punishment of those who violate its terms cannot be conclusive that the intention was to punish those who had already offended under the Gondring act; for if the Junkin act had attempted to provide for the punishment of those who had offended before it took effect, it would, in that respect, have been an *ex post facto* law.   When the Gondring act expired, the prosecution of all illegal acts committed under it prior to the last year was barred by the statute of limitations in any event; and the legislature, no doubt, thought that, as no effective suits for the forfeiture of the charters of offending corporations had been brought under the Gondring act during the seven years of its existence, none would be brought under it, even if left in force for another year.   Therefore, it determined to do away with that act entirely and enact one that stood some chance of enforcement.   The result was the passage of the Junkin act which is much less drastic in that respect than the other act. Then, in order to make it effective, the legislature made an appropriation of $10,000 for the enforcement of the Junkin act, but made no provision whatever for the enforcement of the Gondring act.   This indicates very clearly which act the legislature intended to be enforced.   I am therefore of the opinion that the legislature did not intend the saving statute above referred to to  apply to the Gondring act, and that said act was repealed as to causes of action which had accrued under it as well as to future causes of action.   But, if I should be mistaken in that respect, still I think it clear that this particular action

can only be maintained, if at all, under the Junkin act. From the allegations of its petition and from the relief sought, it is plain that the state has elected to proceed under that act. It cannot proceed under both acts at the same time for the same offenses. For if the Gondring act is in force and this action is brought under it, and the state has proved its case, then the only thing this court can do is to put an end to the existence of the defendant corporations. That is the express command of the Gondring act, and the court has no discretion in the matter. When the legislature speaks upon a matter wholly within its jurisdiction, the courts have no discretion but must enforce its commands. *State v. Pennsylvania & Ohio Canal Co.*, 23 Ohio St. 121; *United States v. Trans-Missouri Freight Ass'n*, 166 U. S. 290. On the other hand, if the Junkin act is in force and the defendants are guilty of the acts charged, it is the duty of the court to perpetually enjoin them from the further commission of such acts, unless the court think it would be more injurious to the public to do so than to enter a conditional decree to take effect in the future, such as the court may make under the Junkin act. But it is plain that the court cannot enter such a decree if it has already put an end to the defendant corporations under the Gondring act. The state cannot have destruction under the one and restraint under the other. The two things are, in their natures, incompatible; for, after a corporation was destroyed and completely ended under the Gondring act, how could it be perpetually enjoined from doing evil under the Junkin act? The restraining power of this court is not supposed to reach the dead.

"In its petition the state alleges the existence of a combination and conspiracy in restraint of trade and commerce on the part of the defendants, which was in existence at the time the petition was filed, namely, August 2, 1905, over a month after the Junkin act went into effect. A temporary injunction was at that time asked for and obtained restraining the defendants from further

proceeding in the prosecution and carrying out of the alleged combination and conspiracy. The state was entitled to an injunction only on the theory that the defendants were guilty of the acts charged at the time of the bringing of the suit; for it did not seek to enjoin the defendants from doing something that had already been done. Furthermore, according to the allegations of the petition, the combination and conspiracy that was in force amongst the defendants when this action was brought was a combination and conspiracy that had been in existence for several years. It was one continuing conspiracy, and this suit was brought to put an end to it by restraining the defendants from further carrying it out. The state could not cut it in two, and dispose of one part under the Gondring act and the other part under the Junkin act. It must be disposed of under the one act or the other. While I do not think it would make any difference in this case if it were otherwise, yet the authorities generally hold that equity has no jurisdiction to dissolve and put an end to corporations unless expressly authorized to do so by statute. The proper and appropriate remedy for that purpose is *quo warranto*. Clark, Corporations, p. 245-248; 4 Am. & Eng. Ency. Law (1st. ed.), 303-304; 5 Thompson, Corporations, sec. 6,703. It is possible that, even at common law, equity had the power to enjoin corporations from committing acts injurious to the public welfare; but that is quite a different matter from destroying them altogether. *Quo warranto* was the only proper remedy when that was the object in view. And, as we have seen, injunction and *quo warranto* are incompatible in the same action for the same offense.

"The Gondring act provides that, for a violation of any of its provisions by any corporation, it shall be the duty of the attorney general of the state to institute suit or *quo warranto* proceedings in any county in this state in which such corporation was organized, or is engaged in transacting business, for the forfeiture of its charter rights and franchise, and the dissolution of its corporate existence.

Section 704 of the code says that, when any persons within this state, being incorporated, do or omit acts which amount to a surrender or forfeiture of their rights and privileges as a corporation, an information may be filed against them. Section 707 says that such information shall consist of a plain statement of the facts which constitute the grounds of the proceeding, addressed to the court, which shall stand for an original petition. Then, after providing for the appearance of the defendant and a trial, section 715 provides that, 'if a corporation be found * * * to have done acts which amount to a surrender or forfeiture of its privileges, judgment shall be rendered that such defendant be ousted, and altogether excluded from such office, franchise, or privilege.' A plain, speedy and adequate remedy is thus provided by statute by an information in the nature of *quo warranto* for ousting and putting an end to corporations violating the law. And since the only remedy or penalty in a civil action provided by the Gondring act is one of ouster and forfeiture of franchise, without discretion on the part of the court, no proceeding would be necessary or appropriate for that purpose other than the one by the information provided for by the statute. No equitable relief would be necessary or appropriate, and, least of all, a perpetual injunction which could take effect only after the offending corporation had been put out of existence. It seems plain that if the state had intended to proceed under the Gondring act for a forfeiture of the franchises and existence of the defendant corporations, it would have adopted the plain remedy provided for that purpose by the statute, and would not have resorted to equity, and asked for a perpetual injunction, as it has done in this case.

"I therefore conclude that the state has elected to proceed under the Junkin act in this case, regardless of whether the Gondring act has been repealed as to causes of action which accrued under it while it was in force."

3. The third and fourth exceptions of the state to the report of the referee are: "(3) Excepts to the conclusion

of law that the state is not entitled to an injunction restraining the defendants from soliciting or receiving rebates from the railroad companies. (4) Excepts to the conclusion of fact that all the shippers similarly situated were paid an elevator charge of $1\frac{1}{4}$ cents a hundred by the railroads, and that such payment was not a rebate forbidden by law." The facts in regard to the elevator charges were found by the referee as follows: "(1) On all grain shipped from the terminal elevators in this state to points on the Mississippi river, or beyond, which is loaded into the cars from such elevator, an elevator charge of $1\frac{1}{4}$ cents a hundred is paid to the elevator loading the car by the railroad company receiving the grain for shipment. (2) This practice is universal and is paid by all railroads to all elevators under the same circumstances and conditions. It is also paid to all shippers who load a car load of grain into an outgoing car for such points at places where there are terminal elevators. It is an open rate to all and is included in the tariff sheet of some railroads, notably, the Missouri Pacific and the Chicago & Great Western, and is paid by them to all shippers shipping grain over said roads to eastern and southern points. (3) On through shipments, that is, on shipments from within this state to points on the Mississippi river, and beyond, which are not transferred through any elevator in this state to any railroad in this state, no elevator charge is paid from the railroad company carrying the grain directly to any elevator company in this state. In such cases the elevator charge is paid by the railroad company to the consignee at the end of the shipment. So that on all such shipments an elevator charge of $1\frac{1}{4}$ cents a hundred is paid to some one. (4) On all purchases of grain for shipment from this state to points on the Mississippi river, or beyond, in car load lots, this elevator charge is taken into consideration. The purchasers in Chicago and St. Louis at least, and doubtless others, designate in their bids whether or not they are to receive the elevator charge. They bid $1\frac{1}{4}$ cents a hundred more for

grain when they are to receive such charge than when they are not, and the senders of through shipments get 1¼ cents a hundred more for their grain in the eastern and southern markets than do the elevator companies who receive such elevator charge. (5) The price received by the producers of grain in this state is just the same whether the grain is transferred through a terminal elevator in this state which receives said elevator charge, or whether it is shipped directly from the point of production to the point of consignment in the east or south. (6) According to the evidence in this case, the payment of this elevator charge by the railroads practically amounts to a reduction of the tariff rates as published of 1¼ cents a hundred on all shipments to the eastern and southern markets, and the rate is open to all such shippers alike. (7) But no such elevator charge is paid by the railroads on shipments made from any point in this state to any point in this state, whether the grain shipped passes through an elevator or not. In such cases the regular tariff rates are charged in all instances."

His conclusion on these facts is supported by him with the following reasons: "The question, then, is: Does the acceptance of the 1¼ cents a hundred by the elevator companies, defendants, in the manner and under the circumstances above set forth, constitute the receipt and acceptance of a rebate under the provisions of section 14 of the Junkin act? The practice of paying this elevation charge has been in force about one year and a half, and was brought about in the following manner: In the year 1899, F. H. Peavy, of Minneapolis, made a contract with the Union Pacific Railroad Company whereby he agreed to build a very large elevator at Council Bluffs, Iowa, at the terminus of the Union Pacific Railroad, and there unload all the cars of grain brought into Council Bluffs over the line of said railroad company, for which service said railroad company agreed to pay said Peavy 1¼ cents a hundred on all grain so unloaded from the cars of said railroad company into said elevator. This contract was carried out,

said Peavy built the elevator and received from the railroad company the stipulated payment. The other railroad companies complained of this arrangement, for the reason, as they contended, that it was an excessive charge for elevation and amounted to giving a rebate from its regular tariff rates by said railroad company to said Peavy, and thus enabled him to pay more for grain than the shipper over the other roads, who paid the regular tariff rates, could afford to pay. The matter finally came before the interstate commerce commission, which gave it a full hearing, and on June 25, 1904, decided that the payment of $1\frac{1}{4}$ cents a hundred for elevation by said railroad company to Peavy under said contract with him was not an unreasonable compensation for the services rendered, and dismissed the complaint. 10 I. C. C. Rep. 309. At this hearing the other railroad companies insisted that, if the Union Pacific Railroad Company was allowed to pay such charge, they would be compelled to do the same thing. To quote from the opinion of the interstate commerce commission: 'They (the other railroads) say, and this is perhaps the main ground of their objection, that if these charges are not unlawful, and the Union Pacific continues the arrangement indefinitely, they will be obliged to make similar allowance for a like service at points where the transfer of grain may by them be deemed necessary.' The commission then quotes from the brief of the other railroads as follows: 'If the allowance be permitted to stand the other railroads in the competitive territory must necessarily meet it in dealing with their patrons, or suffer their patrons and themselves to be placed at a constant disadvantage, with the tendency of creating in their territory a grain-buying monopoly in favor of the Peavy elevator, and a grain-haul monopoly in favor of the Union Pacific Railroad Company.' The commission saw that such practice on the part of the Union Pacific would probably result in forcing the other roads to grant a like privilege to their customers; for the commission say: 'Granted that the allowance to Peavy & Co. places these other car-

riers and grain dealers on their lines at some commercial disadvantage, that it introduces an element of competition which they will be forced to equalize—and that would seem to be its character so far as rival roads are concerned—on what theory can the commission interfere so long as the obligations of the Union Pacific to its own shippers are not disregarded? Plainly, as it seems to us, the indirect effect of the arrangement upon other lines or those who patronize them, whatever that effect may be, is no more a violation of the act than would be a reduction of the rate by the Union Pacific which a competing road, in justice to its shippers or in its own interest, might feel compelled to meet. Any resulting injury or detriment to rival carriers is something which the law does not, and, perhaps, should not, seek to prevent.' As the commission refused to declare the payment by the Union Pacific to Peavy unlawful, but permitted its continuation, the other roads, as predicted by the commission, were forced to grant the same concession to shippers on their lines. Peavy & Co. were themselves extensive purchasers of grain, and were the owners of 60 per cent. of the grain loaded into their elevator by the Union Pacific, on which they received the elevator charge the same as on grain not owned by them. The other railroad companies, in order to equalize matters with the owners of elevators and shippers along their lines, were compelled to grant, and did grant, them the same privilege enjoyed by Peavy & Co. on the Union Pacific. Such was the origin and cause of said practice on the part of. the other railroads. It was brought about by competition, and not by favoritism to the defendants. If it is lawful for the Union Pacific to pay such elevator charge to Peavy & Co., it must be lawful for other railroad companies to pay other elevator companies on their lines the same charge for the same service. And if it is lawful for the railroad companies to pay it, then, it must be lawful for the defendants to receive it. The fact that all the roads, except the Union Pacific, on grain elevated into the Peavy elevator at Coun-

cil Bluffs, pay the elevator charge to the elevator loading
their cars for the east and south, instead of to the elevator
unloading their cars, is a matter of no consequence.
Practically all the grain unloaded from the Union Pacific
into the Peavy elevator goes east and south, and it is
with such shipments that the other roads have to compete.
So they all pay the elevator charge on the same class
of shipments only.   And it amounts to the same thing
with the elevator companies; for, in order to load cars
going east and south, they must unload cars coming from
other directions.   The interstate commerce commission
found, as a matter of fact, that the Peavy company did
not receive any elevator charge from the other roads on
outgoing shipments of the grain shipped in by the Union
Pacific Railroad Company.   So that on such grain the
Peavy company only receives the one charge for elevation,
the same as the other roads on grain shipped east and
south by them.   The action of the railroad companies
merely equalizes the matter between all shippers sending
grain east and south from Missouri river points, or ter-
minal points in this state.   The Peavy elevator at Council
Bluffs is now owned by the defendant Omaha Elevator
Company, which has succeeded to the rights of Peavy
under his contract with the Union Pacific.   As its ter-
minal elevator is at Council Bluffs, Iowa, outside of the
jurisdiction of this court, it was conceded by the state, on
the argument, that what it did at its elevator in Iowa could
not be a violation of the Junkin act.   It seems to me
equally clear that what the railroad companies in this
state are forced to do by competition with a concern out-
side of this state and of the jurisdiction of this court can-
not be a violation of the Junkin act, when they treat all
persons engaged in the same business, under the same cir-
cumstances, exactly alike."

The referee declined to determine whether this court
has jurisdiction over the question discussed.

It is contended that these elevator charges affect only in-
terstate commerce, which is wholly left to congress to regu-

late; and that this court is without jurisdiction in the matter. There seems to be merit in this contention. The argument is that the allowance of the elevator charges to shippers affects the price paid for grain in this state and gives to some shippers advantage over others. We do not quite see how this is true, since, as shown by the referee, these charges are not allowed except to terminal elevators, and all buyers of grain in this state for export are on an exact equality; but, if it were true, it would not help matters at all to restrain those operating elevators in this state from receiving these charges, while the elevators of Council Bluffs and Mississippi river points continue to allow them. The whole matter, it seems, is proper for interstate regulation, and the interstate commerce commission has justly assumed control of it.

4. The defendants insist that the evidence is not sufficient to support the general findings of fact against them. We think that, upon the evidence as it was submitted to the referee, the findings of fact are justified, for the reasons stated by the referee in his report. After the report of the referee was submitted to the court, some of the defendants, by written motion, requested the court to remand the case to the referee, "with instructions to receive such legal evidence as may be offered by defendants to prove their claim that, prior to the taking effect of the Junkin law, there was an arrangement and intent to comply therewith, and to dissolve the Nebraska Grain Dealers Association, and to refrain from any violation of said law, and that said law has not been violated," and to make a further report of findings of fact and conclusions of law. This was not allowed by the court: First, because the defendants had ample opportunity before the referee to make such showing as the facts would warrant, and, while it is undoubtedly within the discretion of the court to reopen the case and to allow further evidence to be taken, this should only be done when it is made plainly to appear that the interests of justice require it; second, the further proof that the defendants proposed to offer was not of such

a nature as to change the result.  The constitution of the
Nebraska Grain Dealers Association provided: "The as-
sociation shall continue in force until dissolved by a ma-
jority of the members in full standing at time of such
action."  And article 8 of the by-laws provided: "Any
member desiring to withdraw from the association must
pay all dues, assessments or fines against him, and give the
secretary thirty days' notice of his intention to withdraw."
The defendants had been members of this association for
several years.  An affidavit was filed in support of their
motion, in which the affiant testifies that he is "an attor-
ney for a portion of the defendants," and has been their
attorney for several years last past, and that a few years
ago he advised his clients that all of the various statutes
of Nebraska purporting to affect grain dealers were in-
valid; that it has since been determined that one of the
acts is valid, and that he believes that all of the others are
invalid.  He says that, if his clients have violated the
Junkin act, the blame should rest upon him, and not upon
his clients.  He also testifies that he is advised, and be-
lieves the fact to be, that a few years ago the officers of
the Nebraska Grain Dealers Association counseled with
an attorney, who was recognized by the bar and by this
court as an able lawyer, "and was advised by him that
none of the acts of the association violated any law of Ne-
braska."  He says that after the Junkin law was enacted,
and before it took effect, his clients called on him for an
opinion as to the law, and that he advised them that the
law was valid; that he then had frequent conferences with
his clients as to the terms of the law, with the end in view
that none of its provisions should be violated and that he
advised the dissolution of the Nebraska Grain Dealers As-
sociation; that in June another conference was held, at-
tended by some of the defendants and by attorneys
representing a majority of the defendants, and at that con-
ference it was determined to dissolve the Nebraska Grain
Dealers Association, and that preliminary steps were then
taken in that direction, and that it was determined that

46

when the law took effect "the greatest care should be taken by every one to see that none of its provisions should be violated either in letter or in spirit"; that he advised his clients to withdraw from the association, and was afterwards informed by them and by the secretary of the association that they had done so; that he believes that other defendants withdrew, "but some remained in, giving as their reason their belief that all should remain in and help effect a formal and official dissolution." Other matters are stated by him in the affidavit, upon information and belief, which would tend to indicate that some of the defendants, at least, were in good faith intending to comply with the Junkin act when the same took effect. From our knowledge of the character and standing of the member of the bar who makes this affidavit, we have entire confidence in the representations made by him. In view, however, of the relations of these defendants with the Nebraska Grain Dealers Association, as shown by the foregoing extracts from their constitution and by-laws, and considering their long connection with that association and operations under its provisions, it would seem that it would require an unequivocal showing of the acts done by the defendant, amounting to a severance of their relations with the association, to justify this court in holding that the injunction in this case was unnecessary and ought not to have been granted, and to relieve the defendants from the costs of these proceedings. The affidavit fails to show affirmatively any such action on the part of the defendants, and so states no sufficient reason for reopening the case.

5. Another exception to the findings of the referee is predicated upon the assertion that the referee considered certain evidence given by one witness as the evidence of another witness; that is, that the referee was mistaken as to the witness who gave the particular evidence in question, and that the witness who was supposed by the referee to have given the evidence was never a member of the Nebraska Grain Dealers Association, and was not in such

a position to know the facts as that his evidence should be given the weight given it by the referee. To set out in full the condition of the record as bearing upon this objection would add considerably to a discussion already quite extended, and from the view we take of the case, already indicated, such discussion is unnecessary. It is sufficient to say that, even if the evidence in question were wholly omitted from the record, we would not consider that there is such a failure of evidence as to require us to set aside the report of the referee.

6. Another ground for objection to the report of the referee is predicated upon the following language quoted in his report: "In a civil action there cannot be a presumption in favor of the innocence of parties who are proved to have been guilty of illegal acts for a number of years, and up to a very short time before the commencement of the action." If this language of the referee were separated from the context of his report, it might be thought to be technically incorrect. There is, of course, no presumption in law that one who has committed a crime will commit another crime if he has opportunity; that is, no such presumption could be used against him upon a trial for the second crime. But, when we take the whole language of the report together, it seems clear that the idea of the referee is correct as applied to this case. The defendants had for several years been engaged in a course of conduct which was made unlawful by the act which took effect July 1, 1905. They made use of an association which they formed to further and carry out a design made unlawful by this act. By the terms of their agreement in forming this association they were to continue as its members and assist in those methods until certain things specified in their agreement were done by them to terminate their connection with the association. Under these circumstances, it devolved upon them to affirmatively show that they had done those things necessary to terminate their connection with the association, and that there was no necessity for the interposition of the court, in the

method pointed out by the act itself, to prevent a continuance of those things which the act made unlawful.

We think that the findings of the referee are supported by the evidence, and his conclusions are justified. The action, however, for the reasons stated, should be dismissed without prejudice as to the defendants, the Holmquist Grain and Lumber Company, William B. Banning, Peavey Elevator Company, American Grain Company, Atlas Elevator Company, Anchor Grain Company, Spelts Grain Company, Evans Grain Company, and John T. Evans.

JUDGMENT ACCORDINGLY.